**ASSOCIATED GAS DISTRIBUTORS, et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Florida Gas Transmission Company, et al., Intervenors.**

**No. 84–1454.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 25, 1985.

Decided Jan. 23, 1987.

David D'Alessandro, Washington, D.C., Janice E. Kerr, J. Calvin Simpson, and Lawrence Q. Garcia, San Francisco, Cal., were on joint brief, for petitioners.

Andrea Wolfman, Atty., F.E.R.C., with whom Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., was on brief, for respondent. Barbara J. Weller, Atty., F.E.R.C., Washington, D.C., entered an appearance for respondent.

Thomas G. Johnson, with whom Jon L. Brunenkant, Kevin M. Sweeney, Michael G. Maloney, Charles M. Darling, IV, Stephen L. Teichler, Carmen Childester Farrell, Nancy J. Skancke, Washington, D.C., Edmunds Travis, Jr., Douglas W. Rasch, David R. Stevenson, Steven R. Severy, Robert D. Haworth, Charles J. McClees, Jr., Houston, Tex., Ronald D. Hurst, Paul W. Hicks, Karen S. Bedell, Dallas, Tex., Walter L. Brignon, Tulsa, Okl., Jennifer A. Cates, Larry Pain, Bartlesville, Okl., Phyllis Rainey, Houston, Tex., F. Nan Wagoner, Bellaire, Tex., Robert B. Perry, Plano, Tex., Merrill E. Fliederbaum, Houston, Tex., Lois Gold Ellen, and Albert Sylvia, III, Los Angeles, Cal., were on joint brief, for intervenors Shell Offshore, Inc., et al.

Michael B. Silva, Houston, Tex., Douglas Field, Robert W. Best, Christopher T. Boland, Frank X. Kelly, and Steve Stojic, Washington, D.C., were on brief, for intervenor Texas Gas Transmission Corp.

William V. Allison, Winter Park, Fla., entered an appearance for intervenor Florida Gas Transmission Co.

J. Evans Attwell, Judy M. Johnson, Thomas G. Wagner, and Cheryl M. Foley, Houston, Tex., entered appearances for intervenor Texas Eastern Transmission Corp.

David M. Whitney, Houston, Tex., entered an appearance for intervenor Aminoil, Inc.

Cecil W. Talley, Shreveport, La., entered an appearance for intervenor Sea Robin Pipeline Co.

Thomas F. Ryan, Jr., and Richard T. Boone, Washington, D.C., entered appearances for intervenor Transcontinental Gas Pipe Line Corp.

Frederick Moring, with whom Jennifer N. Waters, Stanley W. Balis, Philip J. Mause, Daniel Guttman, Reuben Goldberg, Washington, D.C., Robert B. McLennan, San Francisco, Cal., Richard A. Solomon,

Charles H. Shoneman and Patricia Fry Eldridge, Houston, Tex., entered appearances for intervenor Texas Gas Exploration Corp.

James W. McCartney, Houston, Tex., entered an appearance for intervenor Transwestern Pipeline Co.

Stephen M. Hackerman, Houston, Tex., entered an appearance for intervenor United Gas Pipeline Co.

T.J. Carroll, III, Lakewood, Colo., and John P. Furman, Washington, D.C., entered appearances for intervenor K N Energy, Inc.

Before WALD, Chief Judge, RUTH BADER GINSBURG and SCALIA,[*] Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Petitioners in this review proceeding are consumers and distributors of natural gas; they challenge a Federal Energy Regulatory Commission (Commission or FERC) order dismissing their protests concerning the Commission's treatment of certain price escalator clauses (called "area rate clauses") in gas sale contracts between gas producers and pipeline companies. Contradicting the assertions of the contracting parties, i.e., the producer and pipeline, petitioners allege that the escalator clauses in question do not allow producers to raise prices to the ceilings set by the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3301–3432 (1982).

■ FERC has established a regulatory presumption, adopted after notice and comment rulemaking procedures, that the contracting parties' assertion about what they intended their area rate clause to permit is accurate. Hence, if the producer and the pipeline agree that the clause in their contract authorizes the maximum lawful increase, the Commission will not contest the increase. However, the Commission affords interested third parties, such as petitioners, a circumscribed opportunity to protest. To achieve a hearing in face of the Commission's presumption, third-party protestors must show that (1) the contract itself contains language precluding the interpretation advanced by producer and pipeline, or (2) they can adduce extrinsic evidence specifically contradicting producer-pipeline averments of their intent. See Transcontinental Gas Pipeline Corp., Opinion 135, 17 FERC ¶ 61,232 (Dec. 11, 1981).

Responding to petitioners' protests, the Administrative Law Judge (ALJ) rejected the evidence petitioners proffered as an impermissible collateral attack on FERC's presumption rather than a permissible rebuttal trained on particular area rate clauses. The ALJ therefore dismissed the protests, and the Commission affirmed. Transcontinental Pipe Line Corp., Opinion 215, 27 FERC ¶ 61,180 (May 7, 1984), rehearing denied in Opinion 215–A, 28 FERC ¶ 61,018 (July 5, 1984). Petitioners seek judicial review, challenging both the rejection of their evidence as an impermissible collateral attack, and the "impossibly high" burden FERC imposes on protestors as a prerequisite to ordering a hearing. We conclude that the Commission acted within its statutory authority and with the requisite rationality. We therefore affirm the agency dispositions under review.

I. BACKGROUND

The setting for this case is the complex relationship between private ordering and public regulation in the natural gas industry. Before 1978, the Federal Power Commission and then FERC prescribed just and reasonable natural gas rates through rate proceedings under the Natural Gas Act of 1938 (NGA), 15 U.S.C. §§ 717–717w (1982). In a series of decisions in the late 1950's, the Supreme Court imposed the requirement that rate increases filed by producers

---

[*] Judge (now Justice) Scalia was a member of the panel at the time this case was argued, but did not participate in this opinion.

under the NGA be authorized by the contract between the producer/seller and the pipeline/purchaser. *See United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Endeavoring to adjust their contracts to these decisions, producers and pipelines developed a variety of clauses designed to provide authority for rate increases. Under arrangements generally called "indefinite price escalator clauses," the contracting parties specified events that would trigger price rises to a level determined by the particular event. The Commission, by regulation, rejected most clauses of this sort as contrary to the public interest, *see* 18 C.F.R. § 154.-93 (1986), but did not invalidate clauses that tied the contract price to the "area rate" the Commission periodically ·established. *Id.* When the Commission shifted from area ratemaking to national ratemaking, it continued its earlier treatment in force by reading the area rate clauses as national rate clauses. *See Pennzoil Co. v. FERC*, 645 F.2d 360, 367 (5th Cir.), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1981).

In 1978, the Natural Gas Policy Act unsettled this relatively uncomplicated relationship between private contracts and public ratemaking procedures by sharply curtailing the Commission's authority to set wellhead prices. 15 U.S.C. § 3331 (1982). In place of FERC's previous authority, Congress established statutory ceiling prices. *See Public Service Comm'n v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 322, 103 S.Ct. 3024, 3027, 77 L.Ed.2d 668 (1983). The NGPA prices were substantially higher than those the Commission had set, but left private parties free to bargain for lower rates. Producers could sell their gas at the NGPA price only if the gas met categorical statutory criteria *and* had been sold under a contract that authorized, or could be read

to authorize, the NGPA price. *See* 15 U.S.C. § 3311(b)(9).

Inevitably, the question arose whether area rate clauses, which had been sufficient to supply contractual authorization for price increases under the NGA, would also suffice to permit increases to the NGPA ceiling price. The Commission gradually developed an approach to this question. It concluded in its initial Order 23 rulemaking that neither the language nor the legislative history of the NGPA indicated any congressional intent to preclude the use of area rate clauses as authority for charging the NGPA maximum price. *See* Order 23, FERC Stats. & Regs. ¶ 30,040, at p. 30,315 (March 20, 1979). Whether any *particular* clause constituted sufficient authority for charging that price, however, was a question of the parties' intent. If the parties meant to allow the contract price to float to the highest relevant ceiling set by regulatory authorities, then the clause would supply the requisite authority to charge the NGPA price. *Id.* at p. 30,316. If, on the other hand, the parties merely intended to allow increases to the highest ceiling set, as under NGA ratemaking procedures, by a cost-based methodology allowing for participation by interested persons and, ultimately, judicial review, then the clause would not suffice to authorize a price rise to the maximum NGPA level. *See id.; Independent Oil & Gas Association*, Opinion 77, 10 FERC ¶ 61,214, at p. 61,397 (March 4, 1980).

In Order 23–B and in the Order on Rehearing Order 23–B, the Commission established a presumption in favor of the parties' construction of an area rate clause. *See* Order 23–B, FERC Stats. & Regs. ¶ 30,065 (July 3, 1979); Order on Rehearing Order 23–B, FERC Stats. & Regs. ¶ 30,073 (Aug. 17, 1979). If producer and pipeline agree that an area rate clause in a gas contract was originally intended to authorize price increases to the maximum level set by law, the Commission will not contest that interpretation. *See* Order 23–B at p. 30,451; Order on Rehearing Order 23–B at

p. 30,475–476.[1] To gain a hearing on the matter under such circumstances, a third party with an interest in the contract's interpretation would have to indicate proof, derived from the contract itself or from extrinsic sources, adequate to rebut the presumption in favor of the parties' interpretation. *Id.* Consumers and distributors of natural gas challenged Order 23, Order 23–B, and the Order on Rehearing Order 23–B; in 1981, the Fifth Circuit, in *Pennzoil Co. v. FERC*, 645 F.2d at 389–93, upheld FERC's reasoning in the Order 23 rulings.

The Commission, in the meantime, elaborated further on what third-party protestors must show to overcome the presumption in favor of the parties' asserted view of their contract. As stated in Opinion 77, presumption-rebutting evidence could be either "express terms of the contract [that] exclude rates promulgated by the statute," or "reliable and probative extrinsic evidence which, if true, would specifically contradict the mutual interpretation of the parties." Opinion 77, 10 FERC at p. 61,400; *see also* Opinion 135, 17 FERC at p. 61,-450.[2]

In the case at hand, consumers and distributors of natural gas intervened in a series of proceedings in which pipelines and producers had made the blanket assertion that area rate clauses in thousands of contracts supplied the contractual authority needed to charge maximum NGPA prices. *See* Opinion 135, 17 FERC at p. 61,448. Petitioners initially attempted to show only that the language of the clauses in dispute contradicted the intent alleged by the parties to the contracts; they offered no evidence extrinsic to the contracts to overcome the Order 23 presumption. *See* Opinion 135, 17 FERC at p. 61,448. FERC ALJs reviewed these initial challenges on a pipeline-by-pipeline basis, and summarily dismissed each for failure to meet the protestors' production burden under the Order 23 series. *See Columbia Gas Transmission Corp.*, 18 FERC ¶ 61,183, at p. 61,362 (March 3, 1982). The Commission remanded these determinations for further consideration out of concern that the ALJs might have misread Opinion 77 to shift not only a production burden but also the ultimate burden of persuasion to the third-party challenger. *See* Opinion 135, 17 FERC at p. 61,450 (quoting Fifth Circuit's understanding in *Pennzoil*, 645 F.2d at 392, that FERC's presumption imposed on protestors only "the burden of going forward").

The Commission instructed the ALJs on remand to allow the protestors (1) an opportunity for discovery from the parties to the contracts, and (2) to submit additional, extrinsic evidence. Opinion 135, 17 FERC at p. 61,452–454; *Columbia Gas Transmission Corp.*, 18 FERC at p. 61,362. The instant petition for review centers on the extrinsic evidence proffered, but rejected, on remand. Principally, petitioners produced the testimony of an economist, George Lewis Donkin. *See* Opinion 215, 27 FERC at p. 61,335. Donkin's testimony focused on economic conditions prevailing in the natural gas industry (1) at the time the disputed contracts came into existence, and (2) at the time, years later, when the contracting parties asserted that they intended the area rate clauses to allow for price escalation to the NGPA maximum level. FERC's Chief ALJ rejected Donkin's testimony as a collateral attack on the Commission's presumption, and thus not the "reliable and probative evidence" needed to meet the protestors' burden of production. *See Transcontinental Gas Pipe Line Corp.*, 24 FERC ¶ 63,101, at p. 65,164 (Sept.

---

**1.** More particularly, the Commission established two presumptions: First, that the parties to a natural gas contract know currently what their intent was when they executed the contract; and second, that they are truthful in their assertions regarding that intent. Order on Rehearing Order 23–B at p. 30,475.

**2.** The Fifth Circuit, in a more recent encounter with the *Pennzoil* litigation, criticized the Opinion 77 formulation but refrained from passing dispositive judgment on it, observing that "Opinion 77 is not before this Court." *Pennzoil Co. v. FERC*, 789 F.2d 1128, 1138–39 & n. 27 (5th Cir.1986). This 1986 *Pennzoil* decision does not specifically address the restatement of the Opinion 77 formulation in Opinion 135.

16, 1983). The Commission affirmed the ALJ's determination, Opinion 215, 27 FERC ¶ 61,180 (May 7, 1984), and the protestors filed this petition for review.

## II. MERITS

We clarify first that the validity of the Commission's Order 23 rulemaking series is settled by the Fifth Circuit's 1981 *Pennzoil* decision. Most of the petitioners in this case participated in that litigation and no petitioner here has urged inability or lack of opportunity to do so.[3] *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 335–37, 78 S.Ct. 1209, 1218–19, 2 L.Ed.2d 1345 (1958), establishes that we may not unsettle any issue settled by *Pennzoil*, and petitioners do not argue otherwise.[4]

*Pennzoil* upheld the Order 23–B presumption in favor of the contracting parties' mutual representations that they "meant to contract for whatever regulated rate was available." 645 F.2d at 389–93. The Commission's Order 23 series explicitly stated that it would be incumbent on protestors to "specifically identify" the contract addressed and to "state the reasons why ... any particular contract is inconsistent with the conclusion that [it authorizes the collection of NGPA prices]." Order on Rehearing Order 23–B at p. 30,477. The Commission cautioned that " 'blanket protests' which apply to all natural gas purchase contracts will be summarily dismissed as not having met the burden of production." *Id.*

Recognizing the FERC's Order 23 series is no longer contestable, petitioners target the Commission's more recent elaboration of the burden on protestors. The court in *Pennzoil* had emphasized the availability of the protest procedure as significant to its affirmation of the Commission's orders. 645 F.2d at 389. Petitioners contend that FERC's post-Order 23 pronouncements have made the conversion of area rate clauses into authorizations for NGPA ceiling prices practically invulnerable to third-party protests. This, petitioners say, is not compatible with *Pennzoil's* premises.

In the principal order under review, the Commission has restated the protestor's burden as follows:

> The nature of the evidence a third party must produce in order to negate the contract parties' stated intent and obtain a hearing (absent contract language which a reasonable man would find precluded statutory rates) is reliable and probative extrinsic evidence which "if true, would specifically contradict the mutual interpretation of the parties and be dispositive against the presumption in favor of the contracting parties' interpretation."

Opinion 215, 27 FERC at p. 61,335 (quoting Opinion 135, 17 FERC at p. 61,451). Petitioners say that the Commission is now reading the "specifically contradict" language so restrictively that only evidence specific to each individual contract will do, evidence virtually impossible for protestors to obtain. The Commission's brief adds fuel to the petitioners' claim in a footnote:

> [P]etitioners are correct when they state that the Commission will not accept extrinsic evidence that is not "specific to each individual contract, to satisfy the third-party protestor's burden."

---

**3.** The judicial review provisions of the NGA and NGPA, 15 U.S.C. §§ 717r(b), 3416(a)(4), authorize review petitions filed in a court of appeals within sixty days after the Commission acts on an application for rehearing; these review prescriptions render the court's judgment "final, subject to review by the Supreme Court ... upon certiorari or certification."

**4.** Moreover, the Order 23 series is solidly in place as to all the parties here, because the protest procedure affords interested persons an opportunity to urge that special circumstances or subsequent events call for an exception in

particular instances. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 780–81, 88 S.Ct. 1344, 1361, 1366–67, 20 L.Ed.2d 312 (1968); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1955). What is no longer arguably in court as a result of the 1981 *Pennzoil* decision is the appropriateness of using a private contract frame of reference and, particularly, the intent-based standards of private contract law. *Cf. Gulf Oil Corp. v. FERC*, 575 F.2d 67, 72 (3d Cir.1978).

Brief for Respondent at 28 n. 27 (quoting Joint Brief of Petitioners at 47).

Petitioners' argument would have force, and FERC's position would be correspondingly difficult to defend, if the Commission had indeed established a requirement that rules out all protests not based on evidence "specific to each individual contract." The orders under review themselves, however, impose no such requirement.[5] Moreover, in the text of its brief, the Commission refers to "evidence peculiar to a particular contract or *group of contracts*" as adequate to satisfy the protestor's production burden. *Id.* at 26 (emphasis added).

No doubt, as the "group of contracts" reference indicates, some types of evidence going beyond an individual contract may aid protestors to gain hearings in area rate clause cases. For example, suppose the contracting parties had a course of dealing in which past contracts written in the same terms as a contract at issue had been interpreted to preclude higher rates without renegotiation. Evidence of that course of dealing would surely "specifically contradict" the parties' current assertion that price under the contract at issue can escalate without renegotiation. Trade usage regarding area rate clauses in a particular geographic region might also be relevant and appropriate extrinsic evidence, even though the trade custom evidence does not deal specifically with the parties to a particular contract sub judice.

In short, relevant evidence could be ranged along a continuum, with the most contract-specific evidence at one end and the most general commercial evidence at the other end. It might be a trying task, one best left in the first instance to the Commission, to say at what point evidence proffered as "specifically" contradicting the parties' asserted intent becomes so general as to constitute a rejection of the Commission's presumption approach rather than a rebuttal of the presumption in a particular case. But that task need not be tackled in this case. The Donkin testimony featured by petitioners, and to which we now turn, is indeed the kind that would eliminate rather than rebut the Order 23 series presumption FERC has adopted.[6]

George Lewis Donkin, an economist specializing in public utility regulatory analysis, supplied petitioners with some eighteen single-spaced pages of prepared testimony in support of their protests. *See* Joint Brief of Petitioners, Appendix A. In the main, the testimony presents descriptions of conditions in the natural gas industry at the time the contracts at stake were signed, and the altered conditions that prevailed with the passage of the NGPA. Joint Brief of Petitioners, App. A at 7–12. The descriptions are on a national scale; they do not discuss the commercial dealings or circumstances of any particular pipeline or producer, or even any group of pipelines or producers.

Rejecting Donkin's testimony, the Commission observed: "Arguments such as those of Mr. Donkin were considerations before the Commission in resolving the issues raised in the Order 23 series.... The purpose of the proceedings in the present dockets is not to recover the same ground."

---

**5.** A recent Commission decision, Texas Gas Transmission Corp., Opinion 216, 27 FERC ¶ 61,181 (May 7, 1984), demonstrates that the burden of production, contrary to petitioners' forecast, is not "insurmountable." Third-party protestors in that case met the threshold burden. Notably, the evidence held sufficient was not specific to an individual contract; rather, it contrasted the parties' course of dealings in *other* contracts with the intent they asserted as to the contract in dispute. *See* Brief for Respondent at 28.

**6.** Petitioners also submitted offers of proof in the form of letters between the contracting parties at the time of the NGPA's passage. *See*

Opinion 215, 27 FERC at p. 61,335. These letters reveal the parties' uncertainty whether area rate clauses would be held sufficient to authorize collection of NGPA ceiling prices. Petitioners assert that the letters showing uncertainty specifically contradict the contracting parties' current assertion. The Commission, however, agreed with the Chief ALJ that portions of the letters "actually tend to support the contracting parties'" interpretation. *Id.* at p. 61,338. We have no warrant to instruct the Commission that evidence at best ambiguous as to the parties' intent must be accepted as sufficient to carry the petitioners' burden of production.

Opinion 215, 27 FERC at p. 61,337–338. Cogent as the Donkin testimony may be, we cannot gainsay the Commission's position that the testimony is inconsistent with the presumption in favor of the contracting parties' mutual representations adopted by FERC in the Order 23 series, accepted by the Fifth Circuit in *Pennzoil,* and no longer open to contest.

Donkin's testimony appears to us a textbook example of *non* -specific evidence. It is in no sense specific to any particular contract or group of contracts. It applies with the same force to every gas purchase contract concluded in the time period examined. Were the Commission to accept Donkin's testimony as sufficient to meet the third-party protestors' Order 23 series burden of production in this case, the Commission would be obliged to accept similarly non-specific evidence as sufficient to warrant a hearing in every case. Thus, acceptance of the testimony would effectively destroy the Commission's presumption.[7]

■ It is artificial to contend that petitioners do not attack the presumption at large but offer Donkin's testimony only for its significance in this particular proceeding. Because of its generality, the testimony is no more or less persuasive in this case than it would be in others. In sum, the Donkin testimony is totally at odds with the regime now effective because the Commission presumes, as the Fifth Circuit in *Pennzoil* held it may, that parties to an aging natural gas purchase contract (1) know currently what their intent was when they executed the contract, and (2) will tell the truth currently in reporting their original intent. *See* Order on Rehearing Order 23–B at p. 30,475. The resultant general rule is that area rate clauses, if the contracting parties say so, permit collection of

NGPA prices. The general rule will not hold when a protestor successfully shows that the particular case does not fit the mold, but the generic validity of the Commission's presumption is settled by prior litigation (*Pennzoil* ) and may not be retested in the fashion petitioners tried out.[8]

■ Petitioners assert, finally, that the Commission, by severely restricting third party protestors, has shirked its responsibility to protect consumers. The Commission's responsibility is to safeguard the public against rates that are unjust or unreasonable. *See* Natural Gas Act, 15 U.S.C. § 717(c) (1982). That responsibility, we note, does not call for automatic pursuit of the lowest possible gas prices in every case, for the Commission's charge includes ensuring that gas companies are sufficiently stable financially to provide the public a reliable and continuing supply of gas. *See, e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 791–93, 88 S.Ct. 1344, 1372–74, 20 L.Ed.2d 312 (1968). Turning from that general observation to the matter at hand, we stress that the rates producers here seek to charge are prescribed by the NGPA. Because those rates are set by Congress in the public interest, the Commission would be hard put to find them unjust or unreasonable for the type of gas to which they apply.

CONCLUSION

■ In an attempt to meet their burden of production under FERC regulations, petitioners have offered evidence that does not "specifically contradict" the contracting parties' asserted intent for the area rate clauses at stake. The generality of petitioners' proffer renders it an impermissible collateral attack on, and not a rebuttal of, a presumption upheld in previous litiga-

---

7. In fact, Mr. Donkin himself seemed to understand that this was the goal of his testimony. At the outset of his prepared materials, in response to a question as to the purpose of his proffered evidence, Donkin stated that he had been asked "to examine the reasonableness of the Commission's presumption in favor of the contracting parties...." Brief for Petitioners, Appendix A at 2.

8. The Commission argues that, in any event, the Donkin testimony is not sufficiently reliable and probative to allow the protests to go forward. Having upheld the Commission's determination that the testimony constituted an impermissible collateral attack on the Order 23 rulemaking series, we do not address the reliability or probativeness of the evidence.

tion and not open to relitigation. We therefore affirm the Commission's rejection of the proffered evidence and its summary dismissal of petitioners' protests.

*It is so ordered.*