Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 10, 2003          Decided November 7, 2003

No. 02-1168

SOUTHWESTERN ELECTRIC COOPERATIVE, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOYLAND POWER COOPERATIVE, INC.,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Michael R. Postar* argued the cause for petitioner. With him on the briefs was *Eli D. Eilbott.*

*David H. Coffman*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*William D. DeGrandis* argued the cause for intervenor. With him on the brief was *Bruce D. Ryan*.

Before: RANDOLPH, ROGERS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Southwestern Electric Cooperative, Inc. ("Southwestern") challenges four orders of the Federal Energy Regulatory Commission relating to its withdrawal from the Soyland Power Cooperative, Inc. ("Soyland"). The parties entered into a series of agreements for accomplishing the withdrawal. Due to ambiguities in the agreements, the Commission endeavored to interpret the agreements in a manner that best reflected the parties' intent, consistent with the public interest. On appeal, Southwestern contends that the Commission erred by failing to dismiss Soyland's counterclaims as barred under the Closing Agreement and Mutual Release ("Release") and, alternatively, as unduly discriminatory. Southwestern additionally contends that the Commission was arbitrary and capricious in construing and applying the withdrawal formula.

We hold that the Commission's interpretation of the Release, namely that Southwestern would be released from further liability for its withdrawal obligations to Soyland only once it paid the amount that was ultimately due under the parties' agreements, was reasonable. By contrast, Southwestern's interpretation relies on an exception in the Release while both ignoring anterior language in the Release that limits its effect to *prior* acts or omissions, and also failing to account adequately for the ambiguity of what constitutes a default under the Release. The Commission also reasonably concluded that there was insufficient evidence of undue discrimination, particularly in light of the fluidity of the situation of other contemporaneously withdrawing members. Accordingly, because Southwestern's other challenges did not show the Commission's construction and application of the parties'

agreements to be arbitrary and capricious, but a reasonable effort to reflect the parties' intent, we deny the petition for review.

## I.

Southwestern Electric Cooperative is an electricity distributor serving customers in rural Illinois. Soyland Power Cooperative provides its member-owners with electricity generation and transmission services. All Soyland members are electricity distribution cooperatives in rural Illinois. In 1976, Southwestern entered into a long-term all-requirements wholesale power contract with Soyland that was due to expire in 2015. Southwestern thereby became a member of Soyland, and was represented on Soyland's Board of Directors. Until 1996, Soyland had operated subject to rules of the Rural Electrification Administration, now the Rural Utilities Service ("RUS"), pursuant to the terms of a large loan. RUS required the cooperative to secure the loan by entering into long-term, full-requirements wholesale power contracts with all its members. After paying off its $1.1 billion debt to RUS in 1996, however, Soyland became subject to regulation by the Federal Energy Regulatory Commission. Pursuant to § 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d, and the Commission's regulations, 18 C.F.R. pt. 35, Soyland filed its wholesale power contracts, formula rate for recovery of its costs under those contracts, and its 1997 budget. The Commission accepted those contracts and the formula rate. *Soyland Power Coop., Inc.*, Letter Order, Docket No. ER96–2967 ff. (May 21, 1997).

Relieved of its obligation to maintain the long-term contracts with its members, Soyland formed a special Buyout Evaluation Committee to develop a method for members to withdraw from the cooperative. The committee's formation was spurred by Southwestern's expressed desire, previously frustrated, *see United States v. Southwestern Elec. Coop., Inc. v. Soyland Power Coop.*, No. 86–3419 (S.D. Ill. Dec. 28, 1987) (Memorandum and Order), to cancel prematurely its contract with Soyland. The President of Southwestern's

Board of Directors, who held one of his cooperative's two seats on the Soyland Board, served on the committee. The committee, aided by outside consultants, devised a Withdrawal Policy. The Policy was adopted unanimously by Soyland's Board of Directors, including both Southwestern representatives.

The Withdrawal Policy included a formula for satisfying withdrawing members' obligations to the remaining Soyland members. The Board sought to ensure that the non-withdrawing members would not bear added costs as a result of the early withdrawal of members like Southwestern. Therefore, withdrawing members were required to make a withdrawal payment sufficient to cover their share, among other things, of Soyland's long-term agreements with third parties. The Withdrawal Policy required withdrawing members to make a lump-sum payment, as calculated by Soyland using a Withdrawal Formula, contained in Attachment A of the Withdrawal Policy. The Attachment, entitled "Methodology for Computing Lump Sum Payment of Member Withdrawal," included an "Example of Application," which consisted of 23 "items." Each "item" described how a particular component of the formula might be estimated and allocated among members, and each provided a "reference" to serve as a basis for the item's computation.

Pursuant to the Withdrawal Policy, Southwestern entered into a Withdrawal Agreement with Soyland on November 4, 1996. The Commission approved the Withdrawal Policy and the Withdrawal Agreement by order of May 21, 1997. The parties also signed a Release on May 30, 1997, which freed each party from "any and all claims," "known or unknown," arising from "any act or omission . . . prior to the date of this [Release]. . . ." The Release provided an exception for "any such claim . . . arising out of a failure by Withdrawing Member to perform its obligations under the Withdrawal Agreement. . . ." On May 31, 1997, Southwestern made its exit payment of $40,594,311, as calculated by Soyland. It withdrew from Soyland the following day. As provided for by the parties' agreements, the withdrawal payments were twice

recalculated by Soyland, reducing Southwestern's payment to $40,383,030.

On December 8, 1998, Southwestern filed a complaint with the Commission for a refund of approximately $12 million based on Soyland's alleged miscalculation of the withdrawal payment. *See* 63 Fed. Reg. 71,456 (Dec. 28, 1998). Soyland counterclaimed, seeking an upward adjustment of approximately $3 million of Southwestern's withdrawal payment. The Commission, in the first order on review, 86 FERC ¶ 61,217 (1999) ("*Hearing Order*"), dismissed the complaint in part, denied Southwestern's motion to reject the counterclaims, and established a refund effective date. The Commission set for hearing the computation of the withdrawal payment under the Withdrawal Policy, which it treated as akin to a formula rate.

Following the hearing, the Administrative Law Judge ("ALJ") ruled that Soyland had miscalculated various aspects of the withdrawal payment. *See* 90 FERC ¶ 63,001 (2000) ("*Initial Decision*"). He rejected Soyland's counterclaims as "unduly discriminatory," because they sought additional amounts from Southwestern that Soyland had not sought from two other contemporaneously withdrawing members, which had not filed complaints with the Commission. The ALJ also rejected Southwestern's claim that the mandatory Opt–Out Fee paid by Soyland to Illinois Power, its electricity supplier, as a result of Southwestern's withdrawal had been passed on incorrectly to Southwestern. On the whole, however, the ALJ granted Southwestern much of the relief it had sought. Both parties requested rehearing.

In the second order on review, *Opinion No. 450*, 95 FERC ¶ 61,254 (2001), the Commission summarily affirmed most of the ALJ's rulings, but reversed the finding that Soyland's counterclaims were unduly discriminatory. The Commission reasoned that "undue discrimination" in the FPA context only applies where there is a formula rate disparity, as opposed to when that rate is applied in different ways to particular fact situations. Because the same formula was used for both Southwestern and the other two withdrawing members, Corn

Belt Electric Cooperative, Inc. ("Corn Belt") and Edgar Electric Co-operative Association ("Edgar"), there was no undue discrimination. The Commission noted that it did not have "anything approaching a complete record of how Corn Belt and Edgar's rates were calculated pursuant to the Withdrawal Agreement, as they neither intervened in this proceeding nor filed complaints over the manner in which Soyland made their calculations." *Id*. at 61,885. The parties sought rehearing.

In the third order on review, *Opinion No. 450–A*, 97 FERC ¶ 61,008 (2001), the Commission changed course, resolving most issues in Soyland's favor and rejecting Southwestern's undue discrimination argument on the weight of the evidence. While noting that it was "conceivable" that different calculations based on the same rate could constitute undue discrimination, the Commission found the evidence before it insufficient to establish a prima facie case. The Commission also reversed several of the ALJ's findings as misreading the parties' intent in reaching the Withdrawal Agreement. These findings included whether Southwestern must pay a share of Soyland's loan guarantee costs and its margin on power sales, as well as whether various costs were to be calculated based only on the specific "references" contained in the Withdrawal Agreement. Southwestern requested rehearing.

In the fourth order on review, *Opinion No. 450–B*, 99 FERC ¶ 61,001 (2002), the Commission concluded that Southwestern had failed to show that the Commission's construction of the Withdrawal Policy and the Withdrawal Agreement was unreasonable, explaining that its decision in *Opinion No. 450–A* "benefits the customers by properly enforcing the terms of [the parties'] agreement." *Id.*

## II.

The Commission described its role in reviewing the parties' agreements as "ventur[ing] into this contractual heart of darkness to inform the parties as to their own intent on the disputed issues" in order to "properly enforce the terms of the Agreements, consistent with the public interest." *Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,022, 61,020. There is

little doubt that much in the parties' agreements is ambiguous. The Withdrawal Agreement and Withdrawal Policy set out to enable members to leave a long-term contractual relationship without causing unnecessary harm to the remaining members. However, they fail to spell out explicitly how various components are to be calculated, even though each withdrawal might have an impact of tens of millions of dollars. Instead, the agreements leave the computation of the withdrawing utility's lump-sum exit payment up to Soyland to compute, based primarily upon the twenty-three items in Attachment A of the Withdrawal Policy. However, Soyland and Southwestern have long disputed whether the Attachment items are mere examples, or if they constitute the definitive method for calculating the relevant parts of the withdrawal payment.

The Commission's efforts to interpret ambiguous language indicate a continuing attempt to make sense out of the parties' intent. Our review indicates that, rather than reflecting what Southwestern characterizes as the Commission's vacillation in "seesaw rulings," Petitioner's Reply Br. at 1, the orders on review reflect the Commission's willingness to reexamine its interpretation in light of the parties' arguments on rehearing in order to apply the agreements as the parties had intended. Given ambiguity and the technical aspects of some of the determinations, the court's review is most deferential. *See Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814–15 (D.C. Cir. 1998); *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569–70 (D.C. Cir. 1987)*; see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999).

We first address Southwestern's claim that Soyland's counterclaims were barred by the Release Agreement and by their unduly discriminatory nature. In Part III, we address Southwestern's other challenges to the Commission's orders.

## A.

Southwestern contends that upon payment of the withdrawal amount that Soyland calculated, Soyland was barred,

under § 1(b) of the Release, from holding Southwestern liable for Soyland's counterclaims. Because, in its view, Southwestern had satisfied all its obligations under the Withdrawal Agreement, Southwestern was permanently protected from claims based on that Agreement. The "other than" exception in the Release, which provides for ongoing liability for "any such claim[s]...arising out of a failure by [Southwestern] to perform its obligations under the Withdrawal Agreement," was therefore inapplicable. That is, because Soyland did not assert in its counterclaims that Southwestern had failed to perform, and because the amounts sought under the counterclaims do not reflect costs associated with such failure, the Commission, in Southwestern's opinion, erred in ruling that the counterclaims were not barred by the Release.

The Commission construed the Release to mean that Southwestern was not released until it paid the withdrawal amount ultimately determined to be owed pursuant to the Withdrawal Agreement. *See Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,023. Or, as Southwestern views the Commission's interpretation, even though it was Soyland's failure to charge the counterclaim amounts that led to Southwestern's failure to pay the amount that the Commission subsequently determined was required under the Withdrawal Policy, Southwestern's failure to pay that amount was nonetheless a failure to perform its obligations under the Withdrawal Agreement. Southwestern maintains that interpreting the Release such that a failure to pay in 1997 an amount that was not determined to be owed until 2001 improperly expands the "other than" clause beyond its plain meaning.

The difficulty for Southwestern's position arises from the language of the Release. In contending that the plain meaning of the exception precludes Soyland from lodging its counterclaims, Southwestern ignores the anterior language in § 1(b), which provides a release only for "an act or omission" "prior to" the date the Release is signed. The parties signed the Release on May 30, 1997 and Southwestern paid Soyland the next day. The acts alleged in Soyland's counterclaims are therefore not barred, because Southwestern's failure to pay fully what was due occurred after May 30.

Furthermore, Southwestern's characterization of its acts as not falling within the exception clause is unpersuasive, because the exception fails to define what constitutes a default under the Withdrawal Agreement. Southwestern reads the exception to exclude costs that Soyland failed to include in its calculations for the withdrawal payment, because such costs are purportedly unrelated to Southwestern's performance under the Withdrawal Agreement. Soyland, on the other hand, bases its counterclaims on the view that Southwestern failed to meet its obligations under the Withdrawal Agreement by failing to pay the correct amount, thus invoking the exception. Under the circumstances, the Commission reasonably construed the Release to require Southwestern to pay the full amount that was due under the Withdrawal Agreement, and its interpretation of Southwestern's obligations was not contrary to the plain language of the Release.

**B.**

Southwestern's claim that the counterclaims are unduly discriminatory under FPA § 206, 16 U.S.C. § 824e, fares no better. Because the Commission did not approve a change to the calculation of the Corn Belt and Edgar withdrawal payments, Southwestern argued that recovery by Soyland based on its counterclaims would be per se unduly discriminatory. The ALJ agreed, finding that the three cooperatives were "similarly situated" and Southwestern was being asked to reimburse Soyland or allocate items of expense in a manner not required of Corn Belt and Edgar. Southwestern further noted that Soyland testified that at the time of withdrawal it treated all three withdrawing members the same.

Although in *Opinion No. 450* the Commission reversed the ALJ's finding of undue discrimination because Southwestern was not challenging the formula itself, and thus not raising an issue of undue discrimination as that phrase in the FPA had generally been interpreted, the Commission shifted ground in *Opinion No. 450–A*. Earlier undue discrimination cases had usually involved questions of formula design and selection, as opposed to how a consistent formula was applied to a given

set of facts. *See Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,023–24; *see also Cities of Newark v. FERC*, 763 F.2d 533, 546 (3d Cir. 1985). On rehearing, the Commission acknowledged that differing calculations based on the same rate could indeed establish a prima facie showing of undue discrimination. *See Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,023; *cf. Alabama Elec. Co-op., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982). The Commission nonetheless affirmed its denial of the discrimination claim on the ground of evidentiary insufficiency. 97 FERC ¶ 61,008 at 61,023. The Commission explained that the limited evidence the ALJ had relied upon for a prima facie case of undue discrimination, based on his findings that the three cooperatives were similarly situated and that the same Withdrawal Formula was applied to all, did not suffice. *Id.*

First, Southwestern's complaint against Soyland had not alleged undue discrimination, and therefore the record was not properly developed to make out the required prima facie showing. Southwestern had initially argued that Soyland's counterclaims were barred based on Commission practice, as well as on the parties' agreements, including the Release. *See Hearing Order*, 86 FERC ¶ 61,217 at 61,775–76. It was not until the hearing before the ALJ that Southwestern asserted that the counterclaims were unduly discriminatory. *Initial Decision*, 90 FERC ¶ 63,001 at 65,002. Consequently, the Commission did not have before it the materials that its rules required complainants to file. *See* 18 C.F.R. § 385.206(b)(8). Those materials would have included "all documents that support the facts in the complaint in possession of, or otherwise attainable by, the complainant . . . ." *Id.* Given the scant evidence in the record—oral testimony given at the hearing, *see* 90 FERC ¶ 63,001 at 65,002, 65,004— Southwestern had failed to meet its burden to make out a prima facie case of discrimination. *See Mansfield Mun. Elec. Dept. v. New Eng. Power Co.*, 94 FERC ¶ 63,023 (2001). Only upon a complainant's showing that a rate design has different effects on similarly situated customers does the burden shift to the respondent to justify those disparities. *See Electricity Consumers Res. Council v. FERC*, 747 F.2d 1511, 1515 (D.C. Cir. 1984); *Alabama Elec. Co-op., Inc.*, 684

F.2d at 29. The Commission recognized that discrepancies in withdrawal payments could arise for numerous reasons, and that to resolve questions about the computation of Edgar's and Corn Belt's payments would likely require "thousands of pages of record to ventilate." *Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,023. The Commission explained that "[t]he amount and correctness of Soyland's Withdrawal Payments to Edgar and Corn Belt are simply not present on this record for us to begin to compare them." *Id.*

Second, by the time the Commission issued *Opinion No. 450–A*, Corn Belt's and other withdrawing members' positions had changed. Corn Belt and Monroe County Electric Cooperative, Inc. had filed complaints against Soyland. *See Corn Belt Energy Corp. v. Soyland Power Coop., Inc.*, 101 FERC ¶ 61,242 (2002); *Monroe County Electric Coop. v. Soyland Power Coop., Inc.*, 101 FERC ¶ 61,242 (2002). The Commission thus noted that "Our decision that the record developed in this proceeding is inadequate to decide whether the withdrawal payments of Corn Belt and Edgar were properly calculated is reinforced by the fact that other former Soyland members, including Corn Belt, have recently filed complaints against Soyland before the Commission concerning these calculations." *Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,023 n.16. Were the Commission to bar Soyland's counterclaims against Southwestern, the Commission could be obligated, to the extent that the parties were similarly situated, to deny any further claims by Soyland for additional payments from Corn Belt and other complainants. Given the fluidity of the situation, as well as record evidence that Soyland subsequently sought additional exit payments from all later withdrawing members, the Commission reasonably determined that it lacked evidence upon which it could conclude that Soyland's counterclaims against Southwestern were unduly discriminatory and therefore barred.

## III.

Southwestern also contends that the Commission misinterpreted and misapplied the filed rate in calculating the

amounts due under five of twenty-three Items in Attachment A to the Withdrawal Agreement, as well as one section of the Withdrawal Agreement itself (collectively "Items"). The Commission has spilled much ink in explaining its reasoning and identifying the evidence underlying its conclusions, and, given our standard of review, *see Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814–15 (D.C. Cir. 1998), our discussion of Southwestern's challenges is brief. Although the ALJ ruled for Southwestern on several components of the analysis, the Commission's construction of these Items deserves deference.

The Withdrawal Agreement, as noted, was unclear as to how its general formula was to be computed. Based on testimony as well as on the structure of the Agreement, the Commission found "it reasonable to construe these Items as intended to be the exclusive measure of the particular costs to which they refer." *Opinion No. 450–B*, 99 FERC ¶ 61,001 at 61,005. This construction meant that certain costs were not accounted for as comprehensively as was possible. For instance, regarding Item 16 in Attachment A, in accounting for the market value of Soyland's corporate assets, the Commission used as a proxy only the appraisal of the company's headquarters, because that was all that was referenced in the Attachment. *See id.* That reference provided a reasonable ground for the Commission to conclude that that result was the intent of the parties.

Moreover, where specific contract provisions are irreconcilably in conflict with more general ones, the specific provisions control. *See, e.g., Ohio Power Co. v. FERC*, 744 F.2d 162, 168 n.7 (D.C. Cir. 1984). Thus, the Commission could reasonably conclude, based both on parol evidence and on the above principle, that even where the broad terms of the Withdrawal Formula dictated that a general factor was to be taken into account, it was the parties' intent to do so based only on the particular mechanisms established in Attachment A, even if this might at times yield a less comprehensive result. That conclusion is supported by the fact that Southwestern is not consistent in its challenge to use of Items in the Attachment

as the basis for implementing the Withdrawal Formula, but instead only challenges their use in a few particular instances.

The items and formula components that Southwestern contends the Commission erred in construing are:

- Item 5: Soyland's calculation of the mandatory Opt–Out Fee paid to Illinois Power as a result of Southwestern's and other members' withdrawal from the cooperative.
- Item 8: The Unavoidable Fixed Expense calculation. Southwestern challenges both which annual budget was used to calculate these expenses (raising the question of whether the budget used for calculating the withdrawal payment adequately accounted for decreased costs derived from Southwestern's withdrawal as a Soyland member), as well as the escalation rate applied to determine Southwestern's future share of the costs.
- Item 9: The Fixed Generation Operation and Maintenance Expenses calculation. Southwestern makes the same arguments as in Item 8.
- Item 16: Soyland's Corporate Assets (which are calculated as only consisting of the utility's headquarters).
- Item 17: Soyland's subtraction of Deferred Credits (which relate to prepayments by Southwestern that were to be returned within the fiscal year), and Soyland's subtraction of Patronage Capital (which was held by Soyland members, not including Southwestern, that had been members of another utility that had previously merged with Soyland).
- Withdrawal Agreement § 4.2—Continuing Liability: Soyland's recovery from Southwestern of Loan Guarantee and Margin costs incurred prior to Southwestern's withdrawal.

In determining the intent of the parties in forming the contract, the Commission properly credited the testimony of those with first-hand knowledge of the negotiations. The substantial evidence presented by such witnesses was a significant and reasonable factor in overturning certain findings by the ALJ. The ALJ had relied in large part on the

testimony of Southwestern's witness Jatinder Kumar, who acknowledged that he was not on the Buyout Evaluation Committee and thus not part of the deliberative process in which the Withdrawal Policy was developed. As Soyland observes, the Commission has routinely held that testimony adduced to explain contractual intent must be based on direct knowledge to have any probative value. *See Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,032 & n.75 (citing *Questar Pipeline Co.*, 49 FERC ¶ 63,038 at 65,182–83 (1989), *aff'd*, 53 FERC ¶ 61,255 (1990); *Century Power Corp.*, 53 FERC ¶ 61,240 at 61,991 (1990)). The court has recognized that in the case of contract ambiguity, "we look to the background of negotiations between the parties to help resolve contractual ambiguity." *Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1137 (D.C. Cir. 1991); *see also Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1545 (D.C. Cir. 1985) (citing *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981)). Kumar could not testify as to what the Committee members had actually discussed, and instead relied on arguments "compel[led]" by logic and consistency. *See, e.g., Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,030–31. For instance, the Commission, in rejecting several of the ALJ's rulings based on Kumar's testimony, wrote regarding Items 8 and 9, which referenced the 1997 Budget, "Once again, the [ALJ] erred by ignoring what was called for by a specific contractual provision (calculations based on the 1997 budget) and substituting a replacement based on the suppositions of a witness who had no direct knowledge of the issue." *Id.* at 61,033–34.

Wherever possible, the Commission stayed true to the contract's actual terms as "islands of certainty in documents that are awash in ambiguity." *Id.* at 61,031. Parties are not always logical or consistent, and the Commission's proper role, bearing in mind the public interest, was to determine the intent of the parties, even if it were illogical and internally inconsistent. As the Commission wrote regarding Item 16, "Southwestern may well be right that it would have been more accurate to include other properties in estimating the cost of corporate assets, but that is not what was established

as the measure in this contract." *Opinion No. 450–B*, 99 FERC ¶ 61,001 at 61,005. "Ignoring this plain language in determining the intent of the parties essentially and impermissibly rewrites the contract terms to conform to less than clear parole [sic] evidence." *Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,031 (citing *Pennsylvania Ave. Dev. Corp. v. One Parcel of Land in D.C.*, 670 F.2d 289, 292 (D.C. Cir. 1981)).

Soyland produced witnesses who had served on and consulted for the Buyout Evaluation Committee and who repeatedly testified as to the Committee's discussions and expressed intent in formulating the Withdrawal Policy. This parol evidence hued more closely to the language of the contract, and the Commission found it more credible. *See, e.g.*, *Opinion No. 450–A*, 97 FERC ¶ 61,008 at 61,032. Upon review of the record and consideration of the Commission's construction of each of the Items Southwestern challenges, we hold that the Commission was not arbitrary and capricious in its interpretations and applications. The Commission produced a construction of the parties' agreements that was reasonable and based on substantial evidence, and which also paid heed to public policy priorities. Throughout, the Commission kept in mind that it would be contrary to public policy for members of the Soyland cooperative to be saddled with a financial burden that properly belongs to Southwestern.

Accordingly, we deny the petition for review.