# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 7, 2008    Decided June 12, 2009

No. 07-1343

ENTERGY SERVICES, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARKANSAS ELECTRIC COOPERATIVE CORPORATION,
INTERVENOR

---

On Petition for Review of an Order
of the Federal Energy Regulatory Commission

---

*Floyd L. Norton IV* argued the cause for petitioner. With him on the briefs was *Erin M. Murphy*.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Sean T. Beeny* argued the cause for intervenor. With him on the brief were *Phyllis G. Kimmel* and *Milton J. Grossman*.

Before: SENTELLE, *Chief Judge*, and RANDOLPH and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: This petition for review challenges the Federal Energy Regulatory Commission's (FERC's) resolution of a contract dispute between Entergy Arkansas, Inc., an operating subsidiary of petitioner Entergy Services, Inc. ("Entergy"), and Arkansas Electric Cooperative Corporation ("Arkansas Electric"). Entergy contends that the plain language of the contract permits it to take into account transmission system operating constraints in determining the billing rate for energy supplied to Arkansas Electric's customers. In the two rulings under review, FERC found that the relevant contract provisions are ambiguous, but that they are best interpreted to bar this billing practice. *Ark. Elec. Coop. Corp. v. Entergy Ark., Inc.*, 119 F.E.R.C. ¶ 61,314 (2007) [hereinafter Order on Rehearing]; *Ark. Elec. Coop. Corp. v. Entergy Ark., Inc.*, 117 F.E.R.C. ¶ 61,099 (2006) [hereinafter Order on Initial Decision]. FERC's orders are carefully reasoned, and we have little difficulty upholding them under our deferential standard of review.

I

Petitioner Entergy Services, Inc. is the services company for Entergy Corporation, a public utility holding company that sells electricity in Arkansas, Louisiana, Mississippi, and Texas through operating subsidiaries named after their respective jurisdictions -- in this case, Entergy Arkansas, Inc. Arkansas Electric is an electric generation and transmission cooperative that provides wholesale electricity to its members in Arkansas. Entergy and Arkansas Electric share an ownership interest in several resources, including two coal-fired generation plants,

each of which contains two generating units. Arkansas Electric also wholly owns two gas-fired plants. Pursuant to a 1977 Power Coordination, Interchange and Transmission Service Agreement ("Power Agreement") and several location-specific contracts ("Co-Owner Agreements"), Entergy and Arkansas Electric have integrated their generation resources, with Entergy given full control over their scheduling and dispatch. All of the energy produced by Arkansas Electric's resources within the Entergy control area flows through Entergy's multistate transmission system. The Power Agreement provides a billing mechanism known as after-the-fact or theoretical "redispatch," whereby Arkansas Electric compensates Entergy retrospectively for the energy that Entergy has delivered to Arkansas Electric's customers.

During certain periods, Entergy is able to supply Arkansas Electric's customers with energy derived solely from Arkansas Electric's own resources. For this service, the contract is clear that Arkansas Electric owes Entergy nothing. Power Agreement art. V, § 5(a)(i). During other periods, Arkansas Electric indisputably has sufficient resources available to satisfy its customer demand, yet Entergy elects to fulfill some of that demand with energy produced elsewhere. For this service, Entergy bills Arkansas Electric at the "Substitute Energy" rate, which approximates what it would have cost Arkansas Electric to produce the energy itself. *Id.* art. V, § (a)(ii); *id.* exhibit E, Redispatching Principle No. 6.[1]

During still other periods, Arkansas Electric's customers' demand for energy may exceed the physical "capability" of its units, as that term is defined in Article II, Section 17 of the

_____

[1]The term "Substitute Energy" does not appear in the Power Agreement, but has long been used by the parties.

Power Agreement,[2] and Entergy must make up the difference. This discrepancy is billed at a premium rate, known as the "Replacement Energy" rate, under the contract's provision for "energy used by [Arkansas Electric] on redispatch for which [Arkansas Electric] did not have sufficient [Arkansas Electric] Resources available." *Id.* art. V, § 5(c). The premium rate also applies in cases of "outages," when Arkansas Electric's resources are out of service because of emergency or planned maintenance and Entergy must replace the lost generation. *Id.* art. III, § 5.[3]

---

[2]Pursuant to Article II, Section 17, the parties conduct regular tests to determine the net generating capability, or rated capacity, of Arkansas Electric's resources. This is the amount of energy that the resources are physically capable of producing in a given amount of time. The provision states as follows:

> Determination of Capability of Arkansas Electric Owned Resources. The capability of Arkansas Electric Owned Resources shall be net generating capability based on tests conducted in accordance with approved Entergy Corporation capability rating plant testing procedures. The determination of such capability shall be based on tests conducted jointly by Arkansas Electric and Entergy at mutually agreed times; provided, that either party shall have the right to require a new test at any time not sooner than twelve months after the last previous test.

J.A. 98 (acronyms replaced).

[3]Article III, Section 5 states:

> Outage of Arkansas Electric Owned Resources. When any Arkansas Electric Owned Resource is out of service because of emergency or planned maintenance, Entergy will replace Arkansas Electric's generation so lost, to the extent possible, with power and energy from Arkansas Electric Resources.

The instant dispute concerns whether the premium rate applies in yet another situation. During some periods, Arkansas Electric's resources are physically capable of producing energy sufficient to meet its customers' needs -- they are not experiencing outages and their rated capacity is greater than or equal to real-time demand -- yet on account of "transmission system operating constraints," Entergy cannot or will not use all of this capacity. Instead, Entergy satisfies some portion of Arkansas Electric's customers' needs by drawing on other sources. The system operating constraints that lead Entergy to take these actions are the product of many factors and can take many forms. Across its vast transmission system, Entergy's dispatchers may face unpredictable fluctuations in output, load, and third-party deliveries. To meet their obligations effectively in the face of such fluctuations, Entergy maintains, its dispatchers must sometimes turn down energy from Arkansas Electric's units to accommodate delivery from other resources.

The parties mostly agree on the causes and effects of these system operating constraints, but they vehemently disagree on their relevance to billing. Entergy argues that, whenever system operating constraints induce it to supply Arkansas Electric's customers with energy from other sources, that energy must be billed at the Replacement Energy rate because Arkansas Electric "did not have sufficient . . . resources available" to satisfy its customers. Power Agreement art. V, § 5(c). Arkansas Electric counters that, so long as there are no outages and its units are

---

Subject to availability, Entergy will supply the remaining requirements as Replacement Energy which will be billed to Arkansas Electric and paid for at the following [premium] rate . . . .

J.A. 101-02 (acronyms replaced).

capable of meeting its customers' requirements, billing must be calculated at the cheaper Substitute Energy rate.

Entergy did not always take its current position. For most of the life of the contract, Entergy applied the billing methodology that Arkansas Electric favors. Entergy began to reassess this approach in the early 2000s, as system operating constraints grew more acute and financial losses on Substitute Energy mounted. Entergy ultimately determined that its new view was the only permissible reading of the Power Agreement. Indeed, Entergy claimed that it had been unnecessarily "subsidiz[ing]" Arkansas Electric and other co-owners by "protect[ing] [them] from the impacts of system operating constraints." Affidavit of John P. Hurstell ¶¶ 44-45 (J.A. 295-96). Determined to forswear such countertextual corporate altruism, Entergy unilaterally changed its billing procedures in July of 2004. Following an unsuccessful attempt at reconciliation, Arkansas Electric filed a complaint with FERC alleging, inter alia, that Entergy's actions violated the Power Agreement.

An Administrative Law Judge initially sided with Entergy, *Ark. Elec. Coop. Corp. v. Entergy Ark., Inc.*, 114 F.E.R.C. ¶ 63,015 (2006), but the Commission reversed. The Commission found that the Power Agreement is ambiguous as to the billing methodology that applies in situations of transmission system operating constraints, but that it is best read to require Entergy to charge the Substitute Energy rate. Order on Initial Decision, 117 F.E.R.C. at 61,496-97. "The provisions of the billing mechanism," the Commission concluded, "confirm Arkansas Electric's view that they are designed to render it economically indifferent as to the actual amount of power that the Entergy dispatcher decides to dispatch from Arkansas Electric's units as long as the units are physically capable of generating the power needed to serve its own load." *Id.* at 61,500. The Commission

therefore held that the premium Replacement Energy rate applies only if, and to the extent that, Entergy delivers power to Arkansas Electric's customers in excess of the rated capacity of Arkansas Electric's units or, in the case of outages, in excess of the actual dispatchability of the units. *Id.* at 61,496.

In essence, the Commission ratified the parties' pre-2004 understanding of the contract: no matter how difficult it may be for Entergy to utilize Arkansas Electric's resources, the Replacement Energy rate does not apply to periods in which Arkansas Electric's units are physically capable of satisfying its customers' demand. The Order on Initial Decision directed Entergy to cease and desist from its new billing method and to refund, with interest, all charges collected pursuant thereto. The Order on Rehearing reaffirmed and elaborated the same conclusions.

II

This court reviews the Commission's orders under the Administrative Procedure Act's "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). To satisfy this standard, the Commission must "demonstrate that it has made a reasoned decision based upon substantial evidence in the record, and the path of its reasoning must be clear." *Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999) (internal quotation marks and citation omitted). We review claims that the Commission acted arbitrarily and capriciously in interpreting contracts within its jurisdiction by employing the familiar principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We evaluate de novo the Commission's determination that a contract is ambiguous, but we give *Chevron*-like deference to its reasonable interpretation of ambiguous contract language. *See Old Dominion Elec. Coop., Inc. v. FERC*, 518 F.3d 43, 48-49 (D.C. Cir. 2008);

*Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1135-36 (D.C. Cir. 1991). To help resolve contractual ambiguity, we have indicated that the Commission may look to extrinsic evidence such as the background of negotiations, *Sw. Elec. Coop., Inc. v. FERC*, 347 F.3d 975, 983 (D.C. Cir. 2003), and the parties' subsequent course of performance, *S.D. Pub. Utils. Comm'n v. FERC*, 934 F.2d 346, 351 (D.C. Cir. 1991).

Both sides agree that the key parts of the Power Agreement are the billing provisions of Article V, Section 5 and the redispatching principles set out in Exhibit E. Section 5 of Article V states:

> Energy. It is the intent of both parties that all resources of both parties will be dispatched by Entergy for maximum combined efficiency, and that Arkansas Electric's Resources will, on a retroactive basis, considering their *availability* on an hour-to-hour basis, be used to theoretically redispatch Arkansas Electric's load from Arkansas Electric's Resources.
> . . . .
> For billing purposes:
>
> > . . . .
> > (c) Excess Energy. For any energy used by Arkansas Electric on redispatch for which Arkansas Electric did not have sufficient Arkansas Electric resources *available*, Arkansas Electric will pay to Entergy an amount calculated as in Article III, section 5 [i.e., the Replacement Energy rate applicable to outages].
> >
> > (d) Redispatching Principles. All redispatching of Arkansas Electric's Resources will be in accordance with the principles outlined in Exhibit E.

J.A. 111-14 (emphases added and acronyms replaced).  Exhibit E states:

> Redispatching Principles.  For billing purposes, the following principles will be utilized:
>
> > (1) The first cost will be the minimum operating level for *each unit*.  The minimum operating level will be the lowest level of net generation at which the plant can be operated as designated by the owner and furnished to the Entergy dispatcher.
> >
> > (2) For redispatch purposes it will be assumed that *each unit* will not be loaded above 95% of rated capacity unless said unit actually operated at a greater value.
> >
> > (3) For redispatch purposes appropriate consideration will be given to *other* operating constraints which limit the availability of the plant to the Entergy dispatcher.
> > . . . .
> > (6) If the *capability* of Arkansas Electric Resources is sufficient to supply Arkansas Electric requirements and if Arkansas Electric requirements are greater than the energy supplied from Arkansas Electric Resources in an hour, Arkansas Electric will pay to Entergy Arkansas Electric's incremental cost per kWh of the energy deficiency.
> >
> > (7) If the *capability* of Arkansas Electric Resources is not sufficient to supply Arkansas Electric requirements in an hour, Arkansas Electric may purchase Replacement Energy in

accordance with Article III, section 5, after giving consideration to the principles in 1, 2 and 3 above.

*Id.* at 157-59 (emphases added and acronyms replaced); *see also* Order on Initial Decision, 117 F.E.R.C. at 61,501-02 (reproducing additional portions of the Power Agreement).

FERC was correct in finding these provisions ambiguous. Article V, Section 5(c) provides that the Replacement Energy rate will apply during any period in which Arkansas Electric does "not have sufficient resources . . . *available*." Power Agreement art. V, § 5(c) (emphasis added). The very next clause states that all redispatch billing must "be in accordance with the principles outlined in Exhibit E," *id.* art. V, § 5(d), and Principle 7 of that Exhibit indicates that the Replacement Energy rate applies only if the "*capability*" of Arkansas Electric's resources "is not sufficient to supply [its customers'] requirements," *id.* exhibit E, Redispatching Principle No. 7 (emphasis added). Hence, without explanation the key terms ("availability" and "available") in Article V, Section 5 are replaced by another term ("capability") in the corresponding provision of Exhibit E. As the Commission observed, "availability" could therefore be given at least two different meanings:

> (1) the capability of the unit to generate power irrespective of whether and in what amount power is actually dispatched, as Arkansas Electric interprets it, or (2) whether the power the unit is capable of generating is usable by the Entergy dispatcher based on operating conditions on the transmission system, as Entergy apparently interprets it.

Order on Initial Decision, 117 F.E.R.C. at 61,497.

Entergy draws on scattered provisions of the Power Agreement to argue for the latter interpretation. The company argues, for example, that the reference to "maximum combined efficiency" in the lead paragraph of Article V, Section 5 should be read to endorse a systemwide approach to redispatch, and that the Agreement's various references to "availability" should be read to refer to the actual accessibility of resources to Entergy at a given moment in time, rather than to their theoretical accessibility based on the rated capacity of Arkansas Electric's units. Entergy also argues that the reference to "other operating constraints" in Redispatching Principle 3 should be read to encompass more than just constraints on rated capacity.[4]

Although Entergy's textual argument is reasonable, the Commission's reading of the Power Agreement is more so. The Commission observes that in the three places where the contract provides for Replacement Rate billing -- in Article III, Section 5 (regarding outages, *see supra* note 3); Article V, Section 5(c); and Exhibit E's Redispatching Principle 7 -- there is no mention of "transmission system operating constraints" or anything comparable. Order on Initial Decision, 117 F.E.R.C. at 61,496. The Commission further notes that, whereas the other billing provisions turn on undefined terms such as "availability," "efficiency," and "appropriate consideration," Redispatching

---

[4]Entergy further contends that, in interpreting the Power Agreement, the Commission should have consulted certain language in the Co-Owner Agreements. We do not find the language Entergy cites particularly illuminating; more important, the Power Agreement was the rightful focus of FERC's analysis because the Co-Owner Agreements do not address questions of billing methodology. Nor are we persuaded by Entergy's insistence that the Commission should have attended more closely to considerations of "good utility practice." Because such considerations relate primarily to dispatch rather than redispatch (i.e., billing), they are inapposite here.

Principles 6 and 7 offer clear guidance: For any hour in which Arkansas Electric's resources have the "capability" (i.e., the tested capacity, *see* art. II, § 17) to meet its customers' requirements, the Replacement Rate does not apply; but for any hour in which Arkansas Electric's resources are incapable of meeting its customers' requirements, the Replacement Rate does apply.

In construing a contract that "is not well-written and scatters provisions [on billing] in three separate parts," Order on Rehearing, 119 F.E.R.C. at 62,806, the Commission has reasonably chosen to ground its analysis in these specific instructions. *See* Order on Initial Decision, 117 F.E.R.C. at 61,495 n.47 ("In the interpretation of a contract, specific and exact terms have a greater weight than general language. Attention and understanding are likely to be in better focus when language is specific or exact . . . ." (citing *Sw. Elec. Coop.*, 347 F.3d at 982-83)). The Commission infers from Principles 6 and 7 that the term "availability" in Article V, Section 5 is best understood to be synonymous with the term "capability," as defined by Article II, Section 17, unless there are outage conditions that decrease a unit's ability to produce power. *See* Order on Rehearing, 119 F.E.R.C. at 62,806 (clarifying this point); *supra* note 2 (text of Section 17). The two terms are connected but not conflated. For any period in which Arkansas Electric's units have the capacity to satisfy demand *and* are in service, the Commission reasonably concludes, Arkansas Electric necessarily has sufficient resources "available" within the meaning of Article V, Section 5(c).

FERC's reading of the contract has the substantial virtue of harmonizing the Redispatching Principles of Exhibit E with the body of the Power Agreement. By equating "availability" with "capacity" except in cases of outages, FERC manages to adhere to the interpretive maxim of meaningful variation while

honoring the specific commands of Redispatching Principles 6 and 7. Likewise, by construing the phrase "other operating constraints" in Redispatching Principle 3 to follow Principles 1 and 2 in referring to other physical, unit-based constraints (like rated capacity), rather than to systemwide constraints (i.e., transmission system operating constraints), FERC adheres to the canon of *ejusdem generis*, *see Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (D.C. Cir. 2007) ("[W]here general words follow specific words, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (internal quotation marks omitted)), while reconciling those Principles with Article V, Section 5. If there is any other way to make the contract hang together, Entergy has not told us how.

The reasonableness of FERC's interpretation is further confirmed by reference to the parties' course of conduct. *See S.D. Pub. Utils. Comm'n*, 934 F.2d at 351 (observing that course-of-performance evidence "of course is probative" in the context of a FERC contract interpretation dispute). As the Commission found, "[t]he record is replete with evidence that for over twenty-three years *both* parties regarded Arkansas Electric as entitled to pay the lower incremental fuel (coal) cost of its units when the units were capable of meeting Arkansas Electric's load, regardless of whether and to what extent Entergy actually dispatched power from those units." Order on Initial Decision, 117 F.E.R.C. at 61,500; *see also* Oral Arg. Recording at 10:30 (concession by counsel for Entergy that FERC's finding was accurate). That is, for over twenty-three years both parties applied the billing methodology that Entergy now disclaims. When Entergy "restated" the contract in 2001 and refiled it with FERC the following year, *see* Power Agreement pmbl., it did so against a background of more than two decades of consistent billing practice. If the contractual language were in fact as clear -- and if Arkansas Electric's interpretation thereof were in fact

as untenable -- as Entergy now alleges, then it is hard to fathom why Entergy would have applied Arkansas Electric's less favorable interpretation of the billing provisions for all those years prior to 2004. In short, we cannot agree that the only plausible way to interpret the contract is precisely opposite from the way that Entergy itself interpreted it for more than twenty years.

Finally, Entergy maintains that, as a matter of fairness, it deserves additional compensation for those occasions when factors beyond its control compel it to satisfy Arkansas Electric's customers with energy from third parties. The Commission's analysis, by contrast, appropriately focused on the contract the parties negotiated rather than on which side struck the better bargain. *See, e.g.*, Order on Rehearing, 119 F.E.R.C. at 62,808-09. Similarly, the question before us is not whether the *contract* was reasonable, a technical issue as to which courts have little expertise, but rather whether FERC's *construction* of that contract was reasonable -- the kind of legal dispute that this court resolves every day. And as to the latter, we have no doubt.

III

For the foregoing reasons, the petition for review is

*Denied*.