# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2012        Decided August 14, 2012

No. 11-1043

COUNCIL OF THE CITY OF NEW ORLEANS, LOUISIANA, AND
LOUISIANA PUBLIC SERVICE COMMISSION,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARKANSAS PUBLIC SERVICE COMMISSION, ET AL.,
INTERVENORS

———

Consolidated with No. 11-1044

———

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

———

*Michael R. Fontham* argued the cause for petitioner Louisiana Public Service Commission. *Daniel D. Barnowski* argued the cause for petitioner Council of the City of New Orleans, Louisiana. With them on the briefs were *Paul L. Zimmering*, *Noel J. Darce*, *Clinton A. Vince*, *William D. Booth*, and *Daniel D. Barnowski*. *Jennifer A. Morrissey* entered an appearance.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*John S. Moot* argued the cause for intervenors Entergy Services, Inc., et al. in support of respondent. With him on the brief were *John Lee Shepherd Jr.*, *Andrea Weinstein*, *Mary W. Cochran*, *Paul Randolph Hightower*, *Chad James Reynolds*, *Dennis Lane*, and *Glen L. Ortman*.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Council of the City of New Orleans and the Louisiana Public Service Commission petition for review of an order of the Federal Energy Regulatory Commission allowing two companies to withdraw from a regional energy system agreement without paying exit fees not mentioned in the agreement. For the reasons set forth below, we deny the petitions.

I

The Entergy System Agreement (the Agreement), which has been a feature of many cases before this Court, establishes the operating framework for the six Entergy companies servicing Arkansas, Louisiana, Mississippi, and Texas (the Operating Companies). *La. Pub. Serv. Comm'n v. FERC* (*Louisiana IV*), 522 F.3d 378, 383 (D.C. Cir. 2008). The Agreement sets forth a rate schedule administered by FERC and creates a centralized process for determining when and where the Operating Companies will build new power plants. *Id.* at 383-84. By the express terms of the Agreement, each

Operating Company assumes responsibility for the costs of building and operating plants in its own area and retains the rights to the energy those plants produce. *Id.* at 383-84; *see also La. Pub. Serv. Comm'n v. FERC* (*Louisiana I*), 174 F.3d 218, 220 (D.C. Cir. 1999). Each party to the Agreement must also make any excess capacity available "to its sister companies as a backstop for when demand exceeds self-generated supply." *Louisiana I*, 174 F.3d at 220.

In 1982, FERC interpreted the Agreement to require that the cost of producing electricity be "roughly equal" among the Operating Companies. *Louisiana IV*, 522 F.3d at 384. But production costs are likely to be unequal because the Operating Companies use different types of fuel. For example, Entergy Arkansas relies primarily on coal, whereas Entergy Louisiana and Entergy Gulf States rely more heavily on natural gas. *Id.* at 384-85. In order to satisfy the Agreement's equality mandate, FERC requires the Operating Companies with lower production costs to make payments to those with higher expenses. *Id.* at 384.

In 2000, the price of natural gas shot up, sharply increasing the existing cost disparities among the Operating Companies. *Id.* at 384-85. On December 19, 2005, FERC ordered the Operating Companies to make payments to each other to offset any difference in their respective annual production costs greater than eleven percent of the System average. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 113 F.E.R.C. ¶ 61,282 (2005). As a result, Entergy Arkansas was required to pay hundreds of millions of dollars annually to the other Operating Companies. The same day as the FERC order, Entergy Arkansas notified the other Operating Companies that it intended to withdraw from the Agreement eight years later, the earliest it could do so under the Agreement's mandatory notice provision. On November 8,

2007, Entergy Mississippi likewise informed the other Operating Companies that it would exit the Agreement eight years hence.[1]

On February 2, 2009, Entergy Services, Inc., the parent corporation that owns all six Operating Companies, submitted formal notices to FERC on behalf of Entergy Arkansas and Entergy Mississippi, stating that they would exit the Agreement. *See* 18 C.F.R. § 35.15 ("When a rate schedule, tariff or service agreement or part thereof required to be on file with the Commission is proposed to be cancelled or is to terminate by its own terms and no new rate schedule, tariff or service agreement or part thereof is to be filed in its place, a filing must be made [with the Commission]."). The notices provided that the two withdrawing Companies would each operate independently while the other four Operating Companies would remain in the System. Entergy Arkansas and Entergy Mississippi would still be able to buy and sell power from the remaining Operating Companies, but without the preferential treatment the Agreement affords.

On November 19, 2009, FERC accepted the notices and issued orders concluding that the Agreement required no further conditions on the withdrawals other than the already-proffered eight-year notice to the other Operating Companies. *Order Accepting Notices of Cancellation, Entergy Servs., Inc.*, 129 F.E.R.C. ¶ 61,143 (Nov. 19, 2009). The Council of the City of New Orleans and the Louisiana Public Service Commission petition for review of FERC's order. We take jurisdiction under 16 U.S.C. § 825*l*(b).

---

[1] While the parties were clear about Entergy Arkansas's reasons for withdrawal, they did not explain why Entergy Mississippi would be leaving the System.

5

II

We review FERC orders under the Administrative Procedure Act, which requires that we determine whether the challenged action was arbitrary and capricious. *Louisiana IV*, 522 F.3d at 391. Because the gist of the petitioners' argument is directed at FERC's reading of the Agreement, we resort to the learning of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), to see if the agency's interpretation of the contract was reasonable. *Entergy Servs., Inc. v. FERC*, 568 F.3d 978, 981-82 (D.C. Cir. 2009) ("We review claims that the Commission acted arbitrarily and capriciously in interpreting contracts within its jurisdiction by employing the familiar principles of *Chevron*."). Under that standard, "We evaluate de novo the Commission's determination that a contract is ambiguous, but we give *Chevron*-like deference to its reasonable interpretation of ambiguous contract language." *Id.* at 982. The petitioners argue that FERC misinterpreted the Agreement and failed to impose two conditions on Entergy Arkansas and Entergy Mississippi that are required when a Company withdraws from the System. As the petitioners read the Agreement, a Company may not leave the System without compensating the remaining Companies for the assets it takes. And even after leaving, the withdrawing Company must continue making "rough equalization" payments to its former partners. FERC found no such conditions in the Agreement, and we hold that its view is reasonable.

The Agreement provides that "any Company may terminate its participation in this Agreement by ninety-six (96) months written notice to the other Companies hereto." System Agreement § 1.01. FERC held that the Agreement's text places no explicit conditions on the withdrawing Companies save this requirement of notice. The petitioners

concede that the *text* of the Agreement "says nothing about the rights and obligations of withdrawing Companies regarding System assets," but argue that the Agreement's *purpose* requires that withdrawing Companies leave behind the "assets built for the System," Pet'rs' Br. 55, 58, or pay for the assets they take with them, *id.* at 55. This argument from purpose presumes that the System as a whole has claims to individual assets built by each Operating Company. But the text of the Agreement provides that "[e]ach Company *shall normally own* . . . such generating capability and other facilities as are necessary to supply all of the requirements of its own customers." System Agreement § 4.01 (emphasis added). Individualized ownership, as opposed to System ownership, also squares with the Agreement's mandate that each Operating Company "is responsible for the costs of the generation plants in its jurisdiction." *Louisiana IV*, 522 F.3d at 384. While the Agreement establishes a centralized process for determining when and where to build new plants, FERC reasonably concluded that the Agreement's purpose is central planning, not central ownership, and that there is nothing about that purpose that compels payments prior to withdrawal.

Even if the Agreement does not compel withdrawing Companies to pay exit fees, the petitioners argue that an earlier FERC order interpreting the Agreement does. In 2007, FERC stated:

> [I]n light of the history and nature of the existing members' planning and operation of their facilities under the System Agreement, it is possible that it *may ultimately be appropriate* to require transition measures or other conditions to ensure just and reasonable wholesale rates and services for affected Operating

Company members going forward from the effective date of Entergy Arkansas' withdrawal.

*La. Pub. Serv. Comm'n v. Entergy Corp.*, 119 F.E.R.C. ¶ 61,224, 62,315 (2007) (emphasis added). The petitioners point to FERC's reference to "transition measures or other conditions" as a call for the type of exit fees they argue are required here. But the petitioners overlook the language we have emphasized. The fact that FERC put the Operating Companies on notice that it *might* impose additional conditions on withdrawal does not mean it *must* do so now. Certainly an agency may leave open the possibility of future action without binding itself to choose a particular path before it determines the circumstances are right to do so. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("Once an agency has considered the relevant factors, it must define goals for its action that fall somewhere within the range of reasonable choices. We review that choice, like all agency decisions to which we owe deference, on the grounds that the agency itself has advanced."). In this case, FERC reasonably concluded that ninety-six months provided sufficient time for the Operating Companies to plan for withdrawal. *Order Accepting Notices of Cancellation*, 129 F.E.R.C. at 61,603 ("To the extent the remaining Operating Companies are concerned with their own mix of capacity, we note that the 96 month notice period should provide all of the Operating Companies time to adjust their long-term plans and to acquire any needed capacity.").

Putting aside the issue of exit fees, the petitioners argue that a 2001 FERC order requires a withdrawing Company to continue to make rough equalization payments even after exiting the Agreement. *See* Pet'rs' Br. 40-41 (citing *La. Pub. Serv. Comm'n v. Entergy Corp.*, 95 F.E.R.C. ¶ 61,266 (2001)). But that order concerned the very different question

of what conditions are required of an Operating Company that leaves the System *within* the ninety-six month notice period, not what a Company must do when it withdraws *after* that period, as happened here. The 2001 order had no reason to consider the circumstances in which the Operating Companies have time to plan for a withdrawal because proper notice has been given as provided for in the Agreement. *See Entergy Servs., Inc.*, 134 F.E.R.C. ¶ 61,075, 61,359 n.28 (2009) ("[The 2001 order] is not relevant . . . because . . . [there] Entergy Arkansas was seeking to exit the System Agreement . . . before the 96-month notice period had run.").

Finally, the petitioners abandon the Agreement altogether and claim that "rough equalization" payments must continue after withdrawal because of "Entergy's history of single-System planning." Pet'rs' Br. 38. Withdrawal, they contend, will have "disparate consequences" on the remaining Operating Companies, which will then need to charge higher rates to their customers. *Id*. at 39. Because the requirement for rough equalization is "based on these imbalances, not on contract language," the petitioners argue that the payments must continue, potentially forever. *Id.* Not so. The requirement of rough equalization is rooted in the Agreement. *La. Pub. Serv. Comm'n v. FERC* (*Louisiana V)*, 551 F.3d 1042, 1043 (D.C. Cir. 2008) ("We have long viewed the System Agreement as requiring that affiliates share the costs of power generation in roughly equal proportion."). Because rough equalization is tied to the Agreement, it was reasonable for FERC to conclude that once a Company leaves the Agreement, it need not continue to make the payments.

Our decision today reaches only the obligation of withdrawing Companies under the Agreement. As FERC noted, it must still review the post-withdrawal arrangements to ensure that they are just, reasonable, and not unduly

discriminatory. *Order Accepting Notices of Cancellation*, 129 F.E.R.C. at 61,604 ("Entergy will have to file under [the Federal Power Act] to reflect the arrangements to be in place after the withdrawal of Entergy Arkansas and Entergy Mississippi from the System Agreement."). But as far as the Agreement is concerned, FERC's interpretation was reasonable.

### III

For the foregoing reasons, the petitions for review are

*Denied.*